**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Dennis N. Richardson and Susan F. Richardson,**

**Plaintiffs,**

**v.**

**Kit Arom, M.D. and Cardiac Surgical Associates, P.A.,**

**Defendants.**

**Civil No. 01-542 ADM/SRN**

**ORDER**

---

William S. Fishman, Esq. and Howard S. Marker, Esq., on behalf of Plaintiffs.

Richard J. Thomas, Esq. and Bryon G. Asheman, Esq., on behalf of Defendants.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on November 26, 2001, on Plaintiffs' Motion to Amend Complaint to Allege Punitive Damages (Doc. No. 14).

This Order addresses that motion.

## I. PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES.

### A. Factual Background

During the afternoon of April 5, 2001, Defendant Kit Arom performed coronary bypass surgery on Plaintiff Dennis Richardson at United Hospital. (Compl. ¶ 8.) After surgery, at approximately 7:30 p.m., Plaintiff was placed in the Coronary Intensive Care Unit. Id. At approximately 8:30 p.m., Plaintiff's blood pressure fell to 50 to 60 systolic pressure. (Deposition

FEB 06 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

of Kit Arom (Arom Depo.) 50-51.) Plaintiff became cyanotic,[1] and his extremities became very cold. Id. at 52. Defendant attended to Plaintiff, and after approximately 18 minutes, Plaintiff's blood pressure increased to a systolic pressure in the 90s. Id.

At approximately 10:30 p.m., Defendant left the hospital and went home. Id. at 53. At approximately 11:20 p.m., Plaintiff began to lose increasing amounts of blood through his chest tubes. (Deposition of Terri Renick (Renick Depo.) 21-22) Throughout the night, the following amounts of blood drained from Plaintiff's chest tubes: (12:00 a.m.-1:00 a.m.) 1,250 ccs; (1:00 - 2:00 a.m.) 1,250 ccs; (2:00 - 3:00 a.m.)1,530 ccs; (3:00 - 4:00 a.m.) 1,575 ccs; and (4:00 - 5:00 a.m.)1,235 ccs. (Critical Care Flow Sheet of the United Hospital Record (Flow Sheet)).

Testimony from nurses assigned to the Intensive Care Unit indicates that Defendant was repeatedly apprised of Plaintiff's blood loss by phone. At 9:45 p.m., Nurse Derie Sjogren called Defendant to inform him that Plaintiff was hemorrhaging. (Deposition of Derie Sjogren (Sjogren Depo.) 82.) Defendant responded by ordering that Plaintiff be infused with additional packed red blood cells. Id. at 81. At 11:30 p.m., Nurse Sjogren informed Defendant of Plaintiff's initial blood loss and low blood pressure. Id. In response, Defendant asked to speak to Nurse Yomi Adeboye, a nurse with whom he was more familiar. Id. Nurse Adeboye then reiterated to Defendant the information that Nurse Sjogren had just provided. (Deposition of Yomi Adeboye (Adeboye Depo.) 51.) At this point, Defendant ordered that additional blood products be infused to increase Plaintiff's blood coagulation. (Renick Depo. 22-24.)

At 12:30 or 12:45 a.m. on April 6, Nurse Renick, Plaintiff's primary ICU nurse, called and advised Defendant of Plaintiff's further blood loss of 1,250 ccs. Because Defendant did not

---

[1]Lacked sufficient oxygen in the blood.

offer to come back to the hospital, despite the large blood loss, Nurse Renick asked Nurse Lynn Coombes, a nurse more experienced with heart patients, to speak with him. (Renick Depo. 29-31.) At 12:45 a.m., Nurse Coombes informed Defendant of Plaintiff's blood loss and vital signs. (Deposition of Lynn Coombes (Coombes Depo.) 58-60.) Defendant responded by telling the nurses to continue administering the blood clotting products. (Renick Depo. 24.) At approximately 1:30 a.m., Defendant called the hospital and spoke to Pamela Masson, the charge nurse at the time. (Deposition of Pamela Masson (Masson Depo.) 17.) When Nurse Masson informed Defendant that she was not trained in the care of open heart surgery patients, Defendant stated that she was "no good to him." Id. at 18. Nurse Masson then gave the phone to Nurse Coombes, who proceeded to answer his questions. Id.

Nurse Renick also informed Defendant of the exact amounts of Plaintiff's further blood loss at 2:00 a.m. and 3:40 a.m.. (Renick Depo. 37, 45.) At 2:00 a.m. Nurse Renick further informed Defendant that Plaintiff's blood pressure had dropped to 60 to 70 systolic pressure, a level she believes was very low. Id. at 39. In response to these calls, Defendant continued to order blood products for coagulopathy.[2] During her deposition, Nurse Renick stated that she was very concerned that Defendant was not coming into the hospital to tend to Plaintiff. Id. at 46.

To summarize the events and communications she witnessed, Nurse Masson stated "[o]n several occasions I heard the night nurse talking with Dr. Arom describing the number of chest tube containers that had filled with blood, describing the color of the blood, how fast it was coming out. Dr. Arom ordered multiple times different blood products throughout the night." (Masson Depo. 20.)

[2]A problem with blood's coagulation process.

At approximately 5:30 a.m., an EKG revealed a QRS widening.[3] (Affidavit of Bruce Toporoff (Toporoff Aff.) ¶ 14.) In addition, Plaintiff's blood pressure dropped to 50 systolic pressure and his heart rate dropped from 120 to 80 beats per minute. Id. In response, a second "Code 99" was called. Id. After CPR was performed,[4] Plaintiff's blood pressure rose to 70 to 80 systolic pressure, and his heart rate increased to 120 beats per minute. Id. Defendant was again called and apprised of Plaintiff's condition. Id.

At 7:00 a.m., Plaintiff's blood pressure dropped to 40 to 50 systolic pressure. Id. at ¶ 15. A third "Code 99" was called and Defendant was again called and apprised of the situation. Id. In response, Defendant stated that he was on his way to the hospital. (Flow Sheet.) At this point, the hospital switchboard operator issued a page for any available cardiac surgeon to report to the Intensive Care Unit. (Masson Depo. 38-39.)

At approximately 7:15 a.m., Defendant arrived at the hospital. (Arom Depo. 102-03.) When he encountered Nurse Coombes, Defendant asked her "if Mr. Richardson was still with us." (Coombes Depo. 94.) Defendant proceeded to call Dr. Thomas Lillehei, another cardiac surgeon, at his home, and requested that he attend to Plaintiff. Id. at 105. Defendant states that he did not attend to Plaintiff himself, because he believed he had either another surgery scheduled, or a lecture to give that morning.[5] Id. at 106-07. Defendant next informed Plaintiff's

---

[3]Lack of blood for the heart to pump.

[4]The record indicates in addition that "other modalities were administered," but does not indicate what these modalities were.

[5]This explanation is puzzling. The record indicates that Defendant did not have another surgery scheduled, and that Dr. Lillehei actually had two pending surgeries that morning, which had to be delayed. (Lillehei Depo. 64.) And while the record indicates that Defendant did apparently leave for Boston later that morning to give a lecture, Defendant himself has since

family that Dr. Lillehei, rather than he, would be performing the upcoming surgery on Plaintiff.

At approximately 8:20 a.m., Dr. Theodore Lillehei ordered Plaintiff returned to the operating room with a preoperative diagnosis of post-operative bleeding and tamponade.[6] (Toporoff Aff. ¶ 16.) Dr. Lillehei determined the only site of bleeding to be one of Plaintiff's surgical grafts. (Operative Report of Dr. Theodore Lillehei (Lillehei Report.) At that time, Plaintiff had essentially no blood pressure. Id. Dr. Lillehei re-opened the surgical incision, removed the sternal wires and inserted a sternal retractor. Id. Dr. Lillehei discovered a moderate to large amount of clotted blood surrounding the heart, which he evacuated, relieving the tamponade. Id. Because Plaintiff's heart had ceased beating, Dr. Lillehei administered epinephrine and performed cardiac massage. (Lillehei Report.) This entire surgery took approximately one hour to complete. (Lillehei Depo. 64.)

Plaintiff's prolonged post-operative hemorrhaging produced acute renal failure, neurologic damage resulting in a residual seizure disorder, cognitive and motor deficits, respiratory failure, and other neuropsychological deficits. Id. Dr. Bruce Snyder reviewed the medical records for Plaintiff, and included the following summary in his report:

> In my opinion, the patient's postoperative hemorrhage through the night of April 5 to the morning of April 6, 2000 was the cause of the patient's multi-focal cerebral infarctions and anoxic encepalopathy. This is quite clear from the medical records. Mr. Richardson was neurologically intact and functioning in a productive and fully independent manner prior to his surgery on April 5, 2000. He suffered profound hemorrhagic shocks with repeated episodes of cardiac arrest until he was taken back to the

---

stated that he would have cancelled his lecture in order to attend to his patient. (Arom Depo. 116.)

[6]Compression of the heart due to critically increased volume of fluid in the pericardium.

> operating room on the morning of April 6, 2000 by Dr. Lillehei. The hemorrhagic shock and cardiac arrest that the patient suffered resulted in diffuse anoxic brain injury and areas of multifocal cerebral infacrtion is documented above in the patient's history and radiologic studies. His hemorrhagic shock also, of course, resulted in acute renal failure requiring prolonged hemodialysis and in pulmonary failure requiring prolonged ventilatory support.

(Report of Dr. Bruce Snyder.)

Dr. Bruce Toporoff also reviewed the medical records for Plaintiffs, and determined that Defendant's treatment of Plaintiff fell below the relevant standard of care. Dr. Toporoff evaluated Defendant's behavior as follows:

> In his care and treatment of Dennis Richardson Dr. Arom failed to exercise that degree of skill and learning which is normally used by medical professionals in good standing and in a similar practice and under like circumstances. Dr. Arom knew or should have known by 12:30 a.m. on April 6, 2000 that Dennis Richardson was suffering life threatening post operative hemorrhage and that emergency surgery was necessary to repair the bleeding so as to avoid further deterioration and potential death. Dr. Arom also departed from the standard of care when he did not return to the hospital to treat Dennis Richardson in a timely fashion. In spite of his knowledge that Dennis Richardson was undergoing significant post-operative hemorrhaging, Dr. Arom negligently and inexplicably failed to return to the hospital to provide essential surgical care and treatment. . . .
>
> I believe, to a reasonable medical certainty, that the damages described in paragraph 19 could have been prevented. With proper treatment and timely intervention Dennis Richardson would not have suffered the severe complications arising from the delayed follow-up surgery and treatment.

(Toporoff Aff. ¶¶ 18 & 20.)

During his deposition, Defendant was asked to review the medical records. He similarly concluded that he should have returned to the hospital to treat Plaintiff:

A When I found out from the record here that he's bleeding that much I should have come in and take him back to the operating room.

Q. Okay. At what point in time does the record show you should have taken him back to the operating room?

A. I should have taken him back to the operating room if I know that he bled 1,250 cc's at – at 12:30. I should have taken him back then because it's going up from 220 and then it was 650 or 1,250. That – that's a lot of blood. That – that – he should be taken back to the operating room.

Q. Okay. That would give you cause to believe that the man has a surgical bleed; is that correct?

A. Absolutely.

(Arom Depo. 64-65.) Defendant also stated that regardless of whether Plaintiff was suffering from coagulopathy, his blood loss indicated that he required further surgery. Defendant explained, however, that he was never aware of that blood loss.

A. I absolutely do not know that they guy bleeding 1,250 cc's an hour or 1,500 cc's an hour until the next morning.

Q. Wasn't it your business to know that?

A. It's my business to know that, but somehow I did not.

Q. Were you sleeping?

A. No, I able to communicate on the phone. I be able to – I be able to order the clotting factors, able to find out what the cardiac output, what the blood pressure is, what the oxygenation is, the guy was stable or not, I know all of those.

Q. Why did you order all those clotting factors?

A. Because the – the – the clotting factors are all abnormal all along. It never once that the clotting factors been normal during the night. Now, the guy is sick to start with, okay,

very sick to start with. We had to put a balloon in, all those things. The guy had some coagulopathy there. It's risk too that involved either way, but I – it does matter. The risks are – if they guy bled 1,200 cc's, 1,500 cc's you have – or I have to take a risk, even if he going to arrest in the operating room and die in front of me I should have, I should have done that –

Q. Yes.

A. – but somehow I did not.

Q. Okay. And you can't really give us a good reason –

A. I – I can't.

Id. at 75-76.

**B. Pleading Requirements**

"In the Federal Courts of this District, the pleading of a punitive damage claim, under causes of action premised upon the Laws of the State of Minnesota, must generally conform to the requisites of Minnesota Statutes Sections 549.191 and 549.20." Ulrich v. City of Crosby, 848 F. Supp. 861, 866 (D. Minn. 1994) (Erickson, M.J.); Zeelan Industries, Inc. v. de Zeeuw, 706 F. Supp. 702, 705 (D. Minn. 1989) (MacLaughlin, J.); Kuehn v. Shelcore, Inc., 686 F. Supp. 233, 235 (D. Minn. 1988) (Devitt, J.); Fournier v. Marigold Foods, Inc., 678 F. Supp. 1420, 1422 (D. Minn. 1988).

"As recognized by our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to deter a perceived insurance crisis." Ulrich, 848 F.Supp. at 866-67. In all instances in which Minn. Stat. § 549.191 applies, a plaintiff may not assert a punitive damage claim in the complaint in the first instance, but rather

must seek leave of court to amend the pleading pursuant to that section.

Under Minn. Stat. § 549.191, a motion for leave to amend a complaint to add a claim for punitive damages must set forth prima facie evidence in support of the motion, must allege the "applicable legal basis under section 549.20 or other law for awarding punitive damages in the action," and must be supported by one or more affidavits showing the factual basis for the claim. The "applicable legal basis" reads as follows:

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(a).

Thus, at the amendment stage, the supporting affidavits provided by the plaintiff must present a prima facie showing of clear and convincing evidence that the acts of the defendant exhibit a deliberate disregard for the rights or safety of others. Olson v. Snap Products, Inc., 29 F.Supp.2d 1027, 1037 (D.Minn. 1998) citing Swanlund v. Shimano Ind. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). Prima facie evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary 579 (7th ed. 1999); McKenzie v. Northern States Power Co., 440 N.W.2d 183, 184 (Minn. Ct. App. 1989) ("prima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor"); Swanlund, 459 N.W.2d at 154. Under the prima facie standard, "the Court makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof." Ulrich, 848 F. Supp. at 867. Further, the motion should be thoroughly examined, "without considering evidence submitted in opposition." Northwest Airlines, Inc. v. American Airlines, Inc., 870 F.Supp. 1499, 1503 (D. Minn. 1994) citing

Swanlund 459 N.W.2d at 154.

Minn. Stat. § 549.20, subd. 1(b) states that:

> A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

"Where the evidence is sufficient to permit the Jury to conclude that it is 'highly probable' that the defendant acted with deliberate disregard to the rights or safety of others, the 'clear and convincing' standard would be satisfied." Ulrich, 848 F.Supp. at 868.

When a plaintiff moves to add a punitive damage claim, the Court is essentially required "to direct a portion of the verdict against the plaintiff if the evidence of [deliberate disregard] is insufficient." Swanlund, 459 N.W.2d at 155. Thus, as in ruling on a motion for directed verdict,[7] the Court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences from the evidence. See Abbett v. County of St. Louis, 474 N.W.2d 431, 433 (Minn. Ct. App. 1991).

**C. Discussion**

Plaintiffs argue that "it is clear that Dr. Arom acted with deliberate disregard for Mr. Richardson's safety as he disregarded the facts that created a high probability of serious injury or

---

[7] Now denominated in the Federal Rules of Civil Procedure as a motion for the entry of judgment as a matter of law. See Fed. R. Civ. P. 50(a).

death to Mr. Richardson." Plaintiffs state that Defendant was aware of sufficient facts to know and conceded, in his deposition, that he should have taken Plaintiff back to the operating room by 12:30 a.m. on April 6. Defendant's refusal to return to the hospital, Plaintiffs contend, demonstrated callousness and indifference to his patient's condition. Moreover, Plaintiffs state, Defendant's choice not to attend to Plaintiff himself when he returned to the hospital demonstrates "reckless indifference to Mr. Richardson's dangerously critical condition."

In addition, Defendant's decision not to operate further delayed the repair of Plaintiff's bleeding graft site. Plaintiffs also state that Defendant "intentionally sidestepped his responsibilities" by informing Plaintiff's family that he could not perform the operation due to a class he had to attend. Plaintiffs conclude, that the facts of this case establish a sufficient basis for allowing them to add a claim for punitive damages against Defendant Kit Arom.

Defendant contends that Plaintiffs have failed to make a prima facie case of deliberate disregard for Plaintiff's rights and safety. Defendant contends that, at most, he misdiagnosed Plaintiff's condition by assuming it to be a coagulopathy. He did not, however, fail to treat his patient, or deliberately disregard his safety. Defendant asserts that the treatment he ordered was consistent with coagulopathy. With respect to not returning to the hospital, Defendant argues that in a case of coagulopathy, returning would accomplish very little. Moreover, Defendant explains that, "assuming the nurses did tell him the amount of blood loss, he did not understand what they were saying or that it did not 'register' with him."

With respect to the multiple "Code 99s," Defendant states that there was no reason for him to have directly attended to Plaintiff, because "there is no claim that the emergency room physician and staff were unable to handle Richardson's condition or that Arom's assistance was

requested or even needed."

Finally, with respect to not performing the surgery at 8:30 a.m., Defendant explains that Plaintiff first had to be stabilized before the operation could take place. Therefore, waiting for Dr. Lillehei did not delay the surgery. Further, Defendant emphasizes that he did in fact fly to Boston that morning to deliver a lecture to the Massachusetts Society of Cardiothoracic Surgeons. Therefore, he had a specific reason for not performing the surgery.

At this stage of the pleading, the Court is required to examine only the evidence presented by Plaintiffs, and not to consider evidence submitted in opposition. See Northwest Airlines, 870 F.Supp. at 1502-3. However, the Court acknowledges that in federal cases such as Olson, there exists a concern that by allowing plaintiffs to exclude parts of their own testimony from consideration, courts would be doing nothing more than "rubber stamping" allegations in the motion papers. 29 F.Supp.2d at 1033, n.1. (considering plaintiff's own deposition testimony, which was not submitted in support of his motion, in order to comply with the Minnesota Supreme Court's direction to "do more than 'rubber stamp' the allegations in the motion papers." citing Shetka v. Kueppers, Kueppers, Von Feldt and Salmen, 454 N.W.2d 916, 918 n. 1 (Minn. 1990)). Therefore, the Court has not limited itself to the specific sections of Plaintiffs' counsel's affidavit that Plaintiffs emphasize in support of their motion. Rather, the Court has considered entire transcripts and reports in order to decide this issue.

The Court grants Plaintiffs' motion. Plaintiffs have complied with the pleading requirements of Minn. Stat. § 549.191. They have correctly sought leave of the Court to amend the complaint and add a punitive damages claim, rather than alleging it in the first instance. Further, the Court finds that Plaintiffs have made a prima facie case of clear and convincing

evidence that Defendant acted with deliberate disregard for Plaintiff's health and safety.

In this case, Defendant acted with conscious disregard of the high degree of probability of injury to Plaintiff when he chose not to return to the hospital to care for Plaintiff throughout the evening, and also not to personally tend to Plaintiff when he finally did return. Therefore, his behavior fits well within one of the statutory definitions of acting with deliberate disregard for others provided in Minn. Stat. § 549.20, subd. 1(b). Plaintiff's postoperative bleeding in this case was life threatening. He suffered multiple cardiac arrests and his blood pressure repeatedly fell to dangerously low levels. Despite being repeatedly informed of Plaintiff's loss of blood and low blood pressure, Defendant chose not to return to the hospital, and instead continued to order ineffective treatment.

The Court can not accept Defendant's argument that this was a case of misdiagnosis and not deliberate disregard of Plaintiff's safety. When confronted with the records of Plaintiff's blood loss, Defendant himself admitted that such bleeding would provide cause to believe there was a surgical bleed. Moreover, based on the blood loss, Defendant stated he should have taken Plaintiff back to the operating room as early as 12:30 a.m., on April 5. (Arom Depo. 64-65.) In addition, Defendant stated that despite his coagulopathy, Plaintiff's blood loss necessitated that he be returned to surgery. Id. at 76.

Moreover, the facts of the present case differ from the majority of malpractice cases, in which a single decision or mistake results in harm to a Plaintiff. In such cases, the argument that the behavior did not demonstrate deliberate disregard of possible harm would be much more convincing. But in the present case, Defendant was repeatedly informed of Plaintiff's dangerous condition, and he continually chose not to return to the hospital to care for him. Therefore, a

misdiagnosis of coagulopathy in no way justifies Defendant's behavior.

The Court also can not accept Defendant's argument that he was never aware of Plaintiff's enormous blood loss. The Court acknowledges that Defendant made this argument numerous times during his deposition. However, those statements are not convincing within the context of the larger record. Plaintiff's medical records, and the testimony of multiple nurses consistently demonstrate that Defendant was informed of Plaintiff's blood loss and vital signs throughout the night and morning. Not only was Defendant informed of Plaintiff's condition, nurses also enlisted the help of coworkers in order to ensure that Defendant understood the information that was being conveyed. At trial, Defendant might restate his claim that he was not aware of the blood loss, and argue that his deposition testimony should receive more weight than the contradictory evidence. At the pleading stage, however, the Court finds that the record contains clear and convincing evidence that Defendant acted with deliberate disregard for Plaintiff's safety. And therefore, Plaintiffs should be permitted to add a claim for punitive damages.

Finally, with respect to allowing another doctor to perform Plaintiff's surgery, the Court is not swayed by Defendant's explanation that he was obligated to give a lecture later that morning. As stated earlier, Defendant agreed that he "most likely" would have cancelled such a lecture in order to perform the more important surgery. Even without this admission, however, the Court is able to conclude that Defendant was not justified in delegating his obligations to care for his patient. Defendant's own inadequate treatment placed Plaintiff in a position where he required additional surgery to save his life. Defendant's choice not to perform this surgery further supports granting Plaintiffs' motion.

**THEREFORE, IT IS HEREBY ORDERED that:**

Plaintiffs' Motion to Amend Complaint to Allege Punitive Damages (Doc. No. 14) is **GRANTED**.

Dated: February 6, 2002

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge